RECEIVED

JUN 2 5 2026

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

FILED

JUN 2 5 2026

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

JAMES OSHER
EZW123@hotmail.com
2830 Magazine Street
Saint Louis, MO 63106
*Telephone*:  (314) 503-0101

Plaintiff
*In Pro Se*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MISSOURI

## EASTERN DIVISION

| | |
|---|---|
| JAMES OSHER | ) Case No. **4:26-cv-01025-CDP** |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF ST. LOUIS, | ) VIOLATION OF 42 U.S.C. §1983 – DUE |
| ST. LOUIS DEVELOPMENT CORPORATION, | ) PROCESS, |
| LAND CLEARANCE FOR | ) VIOLATION OF 42 U.S.C. §1983 – |
| REDEVELOPMENT AUTHORITY OF THE | ) EQUAL PROTECTION, |
| CITY OF ST. LOUIS, | ) VIOLATION OF TITLE VI – |
| DEVELOPMENT RESOURCE PARTNERS, | ) INTENTIONAL DISCRIMINATION, |
| LLC, | ) VIOLATION OF TITLE VI – |
| OTIS WILLIAMS, in his individual and official | ) RETALIATION, |
| capacities, | ) FRAUDULENT |
| and DOES 1-10 | ) MISREPRESENTATION, |
| | ) FRAUD ON THE COURT, |
| Defendants. | ) FRAUDULENT CONCEALMENT, |
| | ) BREACH OF THIRD-PARTY |
| | ) BENEFICIARY CONTRACT, |
| | ) VIOLATION OF ST. LOUIS |
| | ) ORDINANCE 62481, |
| | ) |
| | ) DEMAND FOR TRIAL BY JURY |
| | ) |

COMPLAINT FOR:

## JURISDICTION

1.      This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 (violations of due process and equal protection), Title VI of the Civil Rights Act of 1964, and the Fifth and Fourteenth Amendments. Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

2.      This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3)–(4), because this action seeks redress for the deprivation of federal constitutional and statutory rights under color of state law.

3.      This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

4.      To the extent Plaintiff asserts supplemental state-law claims—including fraudulent misrepresentation, fraudulent concealment, breach of third-party beneficiary contract, and unconstitutional taking under the Missouri Constitution—this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts.

5.      Defendant City of St. Louis is a municipal corporation operating within this judicial district; Defendant St. Louis Development Corporation ("SLDC") and Defendant Land Clearance for Redevelopment Authority ("LCRA") are agencies or instrumentalities of the City of St. Louis and conduct their operations within this district; Defendant Development Resource Partners, LLC ("DRP") conducts business within this district and acted jointly with municipal officials in the conduct challenged herein.

6.      Defendant Otis Williams, at all relevant times, served as Executive Director of SLDC and acted within the Eastern District of Missouri in both his individual and official capacities.

7.    Venue is proper in the Eastern District of Missouri under 28 U.S.C. § 1391(b) because all defendants reside in this District, and a substantial part of the events or omissions giving rise to these claims occurred within this District, including: the acquisition of Plaintiff's property through eminent domain; the relocation proceedings; the administrative appeals; the issuance of fraudulent findings and orders; and the implementation of federally-funded redevelopment activities tied to the NGA West project.

8.    No jurisdictional or venue defects exist, and this Court is the proper forum for adjudicating all claims asserted herein.

## PARTIES

9.    Plaintiff James Osher is an individual and former property owner and business owner within the North St. Louis redevelopment area targeted for acquisition and clearance for the National Geospatial-Intelligence Agency ("NGA") West project.

10.    At all relevant times, Plaintiff resided and conducted business within the Eastern District of Missouri.

11.    Defendant City of St. Louis is a municipal corporation organized under the laws of Missouri and responsible for approving, funding, supervising, and executing the North St. Louis redevelopment and property-acquisition activities at issue in this case.

12.    Defendant St. Louis Development Corporation (SLDC) is the City's economic-development agency, acting as the administrative and operational arm of the City for redevelopment projects, including property acquisition, relocation administration, and coordination with federal and state entities.

13.    Defendant Land Clearance for Redevelopment Authority of the City of St. Louis (LCRA) is a public entity created under Missouri law, vested with eminent-domain powers, and

responsible for acquiring property, administering relocation procedures, and coordinating demolition and clearance for the NGA project.

14.    Defendant Development Resource Partners, LLC (DRP) is a Missouri limited-liability company contracted by the City, SLDC, and LCRA to administer relocation services to displaced owners and tenants in accordance with federal, state, and local requirements.

15.    DRP participated directly in the relocation determinations affecting Plaintiff.

16.    Defendant Otis Williams was, at all relevant times, the Executive Director of SLDC and the chief official responsible for overseeing redevelopment strategy, public statements to agencies and courts, relocation policy, and all communications related to federal involvement and financial assistance.

17.    At all times herein relevant Defendant Williams acted under color of state law.

18.    Each Defendant participated directly or indirectly in the acquisition, relocation, administrative review, and litigation processes that harmed Plaintiff.

19.    Each municipal Defendant acted under color of state law, jointly and in concert, and is liable for the violations alleged in this complaint.

20.    Defendant Otis Williams, as Executive Director of the St. Louis Development Corporation ("SLDC"), was the final policymaker for the City of St. Louis with respect to redevelopment strategy, relocation determinations, representations to federal agencies, and decisions concerning the applicability of the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA").

21.    Defendant Williams' directives, statements, and actions constituted official policy of both SLDC and the City for purposes of *Monell* liability.

22.    Defendant Otis Williams had actual knowledge of federal environmental funding, EPA Brownfields/TBA involvement, and the City's representations to federal agencies that URA

-4-

protections applied, and nonetheless directed or ratified the position that URA did not apply in Plaintiff's relocation proceedings.

23. Williams personally approved or acquiesced in the relocation framework communicated to Plaintiff and presented to tribunals.

24. The City's enactment and enforcement of Ordinance 62481—its governing relocation policy—together with Ordinances 69977 and 70074, established a mandatory municipal framework requiring relocation assistance in accordance with federal, state, and local law, including the URA.

25. Defendants' systematic refusal to provide URA-compliant relocation benefits under this framework constitutes an official municipal policy and custom of misrepresenting federal-law compliance and denying federally required relocation protections to displaced persons.

26. Defendants' November 7, 2016 written relocation offer issued by Development Resource Partners, LLC ("DRP") (attached as **Exhibit 1**), which affirmatively limited Plaintiff's relocation rights to Missouri Revised Statute § 523.205 and omitted any reference to the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA") or Ordinance 62481, was not an isolated error.

27. It reflected an official relocation policy adopted, ratified, and enforced by SLDC Executive Director Otis Williams and the City of St. Louis to categorically deny URA benefits in NGA-related displacements.

28. This policy was implemented uniformly across multiple properties and repeated verbatim in administrative hearings and judicial proceedings, constituting an official municipal policy or custom for purposes of *Monell* liability.

29. Defendants also maintained a persistent and widespread custom and practice of (a) denying URA benefits to Black residents, (b) providing enhanced compensation and relocation

support to similarly situated white commercial owners, and (c) retaliating against individuals, such as Plaintiff, who advocated for Black displaced residents.

30.    This discriminatory and retaliatory pattern was well known to City officials, occurred repeatedly across dozens of properties, and was carried out by SLDC and LCRA employees with policymaking authority—constituting a custom so permanent and well-settled as to have the force of law.

## FACTUAL BACKGROUND

## THE NGA PROJECT AND THE CITY'S REDEVELOPMENT PLAN

31.    In 2014–2015, the City of St. Louis sought to secure the new National Geospatial-Intelligence Agency ("NGA West") headquarters on approximately 100 acres in North St. Louis.

32.    The project was presented publicly as the largest federal installation in city history and a central component of the City's redevelopment strategy.

33.    To assemble the land required for the NGA facility, the City enacted Ordinance 69977 (January 2015), adopting the "Cass Ave./Jefferson Ave./Parnell St./Montgomery St./North 22nd St. Redevelopment Plan." A copy of Ordinance 69977 is attached as **Exhibit 2.**

34.    The ordinance declared the entire area *"blighted,"* authorized the Land Clearance for Redevelopment Authority (LCRA) to use eminent domain, and expressly required that "all eligible occupants displaced… shall be given relocation assistance, in accordance with all applicable federal, state and local laws."

35.    The City subsequently enacted Ordinance 70074, which authorized up to $20 million ($20,000,000) in financing for acquisition, demolition, and relocation activities

associated with the NGA redevelopment project and required that such activities be conducted in accordance with applicable law. A copy of Ordinance 70074 is attached as **Exhibit 3.**

36.     Ordinance 70074 explicitly tied the project to state and federal funding mechanisms, including Missouri House Bill 514, which authorized the State to reimburse the City for NGA-related project costs.

37.     Together, Ordinances 69977 and 70074 established the legal framework governing the acquisition and relocation of property owners and occupants within the redevelopment area.

38.     Taken together, Ordinances 69977 and 70074 made URA-compliant relocation assistance a matter of City law, not merely federal policy or discretionary practice, and accordingly, even if no federal dollars had yet been disbursed for acquisition or relocation at a particular moment in time, the City of St. Louis, the St. Louis Development Corporation ("SLDC"), and the Land Clearance for Redevelopment Authority ("LCRA") were independently obligated by their own law to provide relocation benefits.

39.     St. Louis Ordinance 62481, § 24.3 ("Applicability"), expressly provides that a displaced person is entitled to relocation payments and assistance unless (1) the provisions of the federal URA are applicable to the displacement; or (2) the person is displaced as the result of the acquisition of real property for a public purpose by the State of Missouri or a political subdivision using solely state or local funds, in which case the provisions of the URA shall apply.

40.     Under the plain language of Ordinance 62481, the URA therefore governs either directly or by mandate in every covered displacement scenario, and there is no lawful circumstance under City law in which a displaced person receives no relocation benefits. The full text of Ordinance 62481 is attached as **Exhibit 4.**

41. Defendants' later assertions, in Plaintiff's relocation proceedings and in Missouri courts, that the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA") "did not apply" and that they had "no obligation" to provide URA-level relocation assistance were directly contrary to the City's own enacted law.

42. Throughout 2015–2016, the City, SLDC, LCRA, and Development Resource Partners ("DRP") carried out mass acquisition and clearance of the neighborhood.

43. Public statements by City officials—including Otis Williams—presented the NGA project as a cooperative endeavor involving the City, the State of Missouri, the U.S. Air Force, and the NGA.

44. At the same time, the Environmental Protection Agency (EPA) conducted federal environmental assessments related to the NGA site, including Brownfield evaluation work, as documented in the Draft Environmental Impact Statement (Draft EIS) and the Record of Decision.

45. The Draft EIS states that relocation and displacement associated with the project would be governed by "city, state, and federal law," including the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA"). A copy of Section 5.1 of the Draft EIS is attached as **Exhibit 5.**

46. A letter from Tetra Tech EC, Inc.—an environmental contractor working in connection with EPA's Brownfields program—also confirms federal environmental assessment work occurring within the NGA redevelopment footprint. A copy of the Tetra Tech letter is attached as **Exhibit 6.**

47. The City never corrected or contradicted those federal representations.

48. To federal agencies, policymakers, and the public, the City represented that the NGA land-assembly process *triggered URA protections*.

49. However, when dealing with Plaintiff and other displaced residents and business owners, the City took the opposite position, claiming the project involved "no federal funds," asserting that the URA "does not apply," and denying relocation benefits on that basis.

50. These contradictory representations were material.

51. The City's statements to federal agencies ensured federal approval of the NGA site selection, while its statements to residents and courts ensured displaced owners received no federal relocation benefits.

52. The NGA ultimately selected the North St. Louis site. The land-acquisition and relocation process, including all determinations affecting Plaintiff, occurred within this federally connected redevelopment framework.

## PLAINTIFF JAMES OSHER, HIS RESIDENCE, AND HIS BUSINESS

53. Plaintiff James Osher is a long-time St. Louis resident, business owner, and property owner.

54. At all times herein relevant, Plaintiff lived and worked within the footprint of the north-side redevelopment area ultimately selected for the National Geospatial-Intelligence Agency ("NGA West") headquarters.

55. Since the early 1990s, Plaintiff owned, operated, and continuously occupied the historic Buster Brown Blue Ribbon Shoe Building located at 1516-1530 North Jefferson Avenue ("Plaintiff's Property"), a 75,000-square-foot mixed-use commercial building that housed both Plaintiff's successful granite, marble, and cabinetry business (Metro MFG) and his 6,000 square-foot residential loft.

56.   Plaintiff's business was one of the largest and most established businesses operating within the redevelopment area; it maintained substantial inventory, equipment, customer accounts, and long-standing vendor relationships.

57.   Plaintiff also held a valid City business license at all relevant times.

58.   Plaintiff resided full-time in the building.

59.   Plaintiff's residential loft was fully furnished, served as his legal residence, and was recognized as such by City officials – including during his campaign for Mayor of St. Louis in 2017, which required City residency.

60.   When the NGA site boundary and redevelopment plan were announced in 2014-2015, Plaintiff's property fell squarely within the footprint designed for acquisition, clearance, demolition, and ultimate transfer to the United States Government.

61.   On March 14, 2016, the Land Clearance for Redevelopment Authority ("LCRA") filed its First Amended Petition for Condemnation, naming Plaintiff as one of the property owners whose land "must be acquired" for the NGA project.

62.   In July 2016, Defendants purported to serve Plaintiff with a 90-day notice to vacate; however, the notice identified and was directed to the wrong legal entity, rendering the attempted service defective.

63.   The City, SLDC, LCRA, and their agents – including Development Resource Partners ("DRP") – classified Plaintiff as a "displaced person" under Missouri law and under the City's own relocation ordinance, thereby triggering obligations to provide relocation advisory services, moving assistance, business re-establishment payments, and comparable-replacement-site benefits.

64.   Despite Plaintiff's clear status as both a residential and business occupant, and despite the City's statutory and ordinance-based obligations, Plaintiff was not provided any

relocation advisory interview, site inspection, needs assessment, inventory evaluation, or written relocation-rights notice required under federal (URA), state, or local relocation law.

65.    Instead, almost immediately after condemnation began, Plaintiff encountered escalating resistance, hostility, and obstruction from relocation officials and City representatives.

66.    Requests for relocation guidance and assistance were ignored, deferred, or denied outright.

67.    Despite being denied relocation advisory services, site inspections, and business re-establishment evaluations required by federal and City law, Plaintiff nevertheless prepared and submitted a preliminary relocation cost estimate in an effort to comply with Defendants' relocation process and to mitigate his damages.

68.    This estimate was prepared without the benefit of URA-mandated advisory assistance, comparable-replacement analysis, or business re-establishment determinations. A copy of Plaintiff's preliminary relocation cost estimate is attached as **Exhibit 7.**

## CITYWIDE RELOCATION POLICY – ST. LOUIS ORDINANCE 62481

69.    The City's relocation policy, Ordinance 62481, titled the "Relocation Policy for the City of St. Louis," governs relocation assistance for City-approved redevelopment projects.

70.    Section 24.3 ("Applicability") provides that any displaced person in such a project "will be entitled to receive … relocation payments and assistance" under the City's policy unless federal relocation law applies.

71.    The ordinance further provides that where displacement results from the acquisition for a public purpose of real property by the State of Missouri or a political subdivision using solely state or local funds, "the provisions of the URA shall apply."

-11-

72. Accordingly, under the City's own ordinance, the URA governs either directly or by mandate in every covered displacement scenario, and displaced persons are entitled to relocation assistance under either federal or City law.

73. Despite this requirement, Defendants asserted to Plaintiff and to administrative and judicial tribunals that the URA did not apply because the project was governed solely by state law.

74. By doing so, Defendants concealed that City law itself expressly requires application of the URA even under a purported "state-only" theory.

75. The City's concealment of controlling law prevented Plaintiff from discovering his statutory rights and further tolled all applicable statutes of limitations.

76. Plaintiff qualifies as a "displaced person" under Ordinance 62481 because his property was condemned through eminent domain for a City-sponsored redevelopment project, and he lost both his residence and his long-standing business as a direct result of that project.

77. Plaintiff therefore held a clear, mandatory entitlement under City law to receive relocation payments and assistance—either under URA (if applicable) or under Ordinance 62481's minimum standards. See Exhibit 4 §§24.2(E), 24.2(K), 24.3

78. Defendants provided Plaintiff with neither federal URA benefits nor the minimum relocation benefits set forth in Ordinance 62481.

79. Instead, they treated Plaintiff as if no relocation laws applied at all.

80. This complete denial of both federal and local benefits violated the City's own binding ordinance, deprived Plaintiff of a protected property interest created by local law, and further evidences Defendants' deliberate policy of concealment and unequal treatment. See Exhibit 4 (minimum required benefits §24.4)

-12-

## FEDERAL ENVIRONMENTAL FUNDING AND THE CITY'S TWO-TRACK MISREPRESENTATIONS

81.    EPA records—including Targeted Brownfields Assessment ("TBA") documents, Environmental Justice evaluations, and the Draft Environmental Impact Statement ("DEIS") — show that the federal government, through the U.S. Environmental Protection Agency ("EPA"), provided federal financial assistance for the environmental assessment and preparation of the NGA site.

82.    On November 7, 2016, Development Resource Partners, LLC ("DRP"), acting as relocation administrator for the City of St. Louis, SLDC, and LCRA, sent Plaintiff a written relocation offer purporting to describe the relocation benefits available to him (attached as Exhibit 1).

83.    In this letter, DRP expressly represented that Plaintiff's relocation rights were governed solely by Missouri Revised Statute § 523.205, and offered Plaintiff only two options: (a) a fixed $3,000 payment, or (b) reimbursement of "actual reasonable moving costs."

84.    DRP's letter referenced possible limited business re-establishment expenses, but made no mention whatsoever of the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA"), its implementing regulations at 49 C.F.R. Part 24, or St. Louis Ordinance 62481.

85.    The November 7, 2016 letter omitted any disclosure that, under Ordinance 62481 § 24.3, the URA governs either directly or by mandate in every covered displacement scenario, including where property is acquired using solely state or local funds.

86.    DRP's letter also omitted any reference to Plaintiff's entitlement to URA-mandated advisory services, comparable replacement housing determinations, differential

-13-

payments, replacement housing payments, appeal rights, and other mandatory federal protections.

87.     By affirmatively framing Plaintiff's relocation rights as limited exclusively to Missouri Revised Statute § 523.205, and by offering only minimal state-level benefits, Defendants concealed the existence of federal and City-law relocation entitlements and misrepresented the governing legal framework from the very outset of Plaintiff's displacement.

88.     This written misrepresentation occurred years before Defendants later repeated the same false narrative in administrative hearings and judicial proceedings—namely, that the project involved "no federal funds" and that the URA did not apply.

89.     The November 7, 2016 letter therefore demonstrates that Defendants' later courtroom statements were not mistakes or misunderstandings, but the continuation of a long-standing, deliberate policy to substitute a weaker state-only relocation scheme in place of mandatory federal and City-law protections.

90.     EPA's Brownfields program is expressly a federal grant program, and EPA's own documents confirm that it conducted federally funded environmental assessments in the exact project footprint where Plaintiff's property was located.  Relevant pages from the Phase II TBA Report are attached as **Exhibit 8.**

91.     In addition, a letter from Tetra Tech EC, Inc.—a federal environmental contractor retained by the EPA—confirms that EPA-funded environmental assessment and Brownfields work was conducted within the NGA redevelopment footprint, including properties subject to acquisition and clearance.

92.     The Tetra Tech letter further reflects that EPA's environmental review and Environmental Justice analysis were undertaken on the understanding that relocation and displacement were governed by applicable federal, state, and local law, including the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA").

-14-

93. The Draft Environmental Impact Statement further shows that EPA relied on information supplied by the City and LCRA regarding compliance with federal, state, and local relocation laws—including the URA—and incorporated those representations into the Environmental Justice analysis.

94. The Environmental Justice section of the DEIS states that the project was being carried out "in accordance with all applicable federal, state, and local relocation laws." See Exhibit 5. This statement could only have been made if the City or its agents represented to federal authorities that the URA applied and would be followed.

95. The City never applied the URA.

96. Instead, the City knowingly withheld URA relocation benefits and concealed the existence of federal involvement from displaced residents, the administrative tribunals, and the courts.

97. EPA published its Environmental Justice findings based on the City's misrepresentations.

98. EPA's assessment assumed URA compliance and therefore concluded that the project avoided disproportionate harm to low-income or minority populations.

99. Had EPA known the City was not applying the URA—particularly in a majority-Black neighborhood—the EJ findings would have been materially different.

100. This misinformation allowed the City to proceed with the NGA land acquisition without providing legally required relocation benefits, enabling Defendants to clear the land faster and at significantly reduced cost.

101. The concealment of federal funding also enabled Defendants to argue—falsely—before the LCRA Hearing Officer, the St. Louis Circuit Court, and the Eastern District Court that the URA did not apply and that Plaintiff had no statutory relocation rights.

102. As a result of Defendants' misrepresentations to Plaintiff, to Missouri agencies, and to the federal government, Plaintiff was wrongfully denied federal relocation benefits, deprived of due process, and forced through an administrative proceeding founded on false premises.

103. EPA Region 7's Brownfields/TBA work and the City's contradictory statements to EPA versus residents reinforce the federal-funding nexus and demonstrate intentional concealment of URA applicability.

## RACIAL DISPARITIES, RETALIATION, AND DISCRIMINATORY TREATMENT

104. Throughout the NGA acquisition project, the City, SLDC, LCRA, and their agents engaged in a pattern of racial disparities in compensation, relocation benefits, and treatment of displaced property owners.

105. Black homeowners and Black business owners in the redevelopment footprint consistently received lower offers, lower relocation payments, fewer advisory services, and less assistance in securing replacement housing or business locations than similarly situated white owners.

106. Public records, City briefings, and contemporaneous statements demonstrate that Defendants were aware of these disparities but made no effort to correct them.

107. Instead, they concealed the differences and continued administering relocation determinations in a racially disparate manner.

108. One similarly situated white business owner received approximately $29 million in compensation and relocation-related benefits for property within the project area.

109. In contrast, multiple Black families were displaced with minimal assistance.

110.    An elderly disabled Veteran owned the corner lot at the Corner of the NGA footprint and was offered a purchase contract if the NGA comes for $3,800 based on a $1,900 appraisal.

111.    Plaintiff regularly assisted and supported Black residents who were being mistreated by relocation administrators.

112.    Plaintiff expressed public concerns about the treatment of Black property owners, the City's failure to comply with URA requirements, and the discriminatory disparities in compensation.

113.    As part of that advocacy, Plaintiff authored and submitted a written complaint to Congressman William Lacy Clay detailing the City's discriminatory relocation practices and failure to comply with federal civil-rights and relocation laws. A copy of Plaintiff's letter to Congressman Clay is attached as **Exhibit 9**.

114.    Shortly after Plaintiff submitted his complaint to Congressman Clay, Plaintiff was contacted by a federal law-enforcement agent and asked to appear at the agent's office to "discuss" the contents of the congressional complaint.

115.    Plaintiff complied.

116.    When Plaintiff arrived at the meeting, the agent placed Plaintiff on camera, advised him that he could go to jail if he made any false statements, and questioned about activities unrelated to Plaintiff's relocation claims.

117.    Following this intimidation, Defendants escalated adverse actions against Plaintiff, including the complete denial of relocation benefits otherwise mandated by law, heightened hostility from City officials, and continued misrepresentation of Plaintiff's rights in administrative and judicial proceedings.

118.    On information and belief, Defendants were aware of the aforementioned agent's actions, as well as the meeting.

119. Defendants retaliated by stripping him of relocation eligibility altogether, denying him every category of assistance provided to other displaced owners—including advisory services, site inspections, moving assistance, re-establishment benefits, and comparable-replacement-housing payments.

120. The retaliation against Plaintiff was intentional, targeted, and linked directly to his protected advocacy on behalf of Black residents.

121. On information and belief, the City and its agents singled Plaintiff out to send a message to other objectors and to suppress further challenges to their relocation practices.

122. These racially discriminatory and retaliatory actions form part of the broader scheme to unlawfully clear a predominantly Black neighborhood while concealing federal involvement, bypassing federal relocation standards, and suppressing complaints about unequal treatment.

## THE CITY'S FALSE STATEMENTS REGARDING FEDERAL FUNDING AND URA APPLICABILITY

123. Throughout the NGA-West site acquisition process, Defendants made contradictory and irreconcilable representations about federal involvement and the applicability of the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA").

124. To property owners, administrative hearing officers, and state and federal courts, Defendants repeatedly asserted that "no federal funds were used" in the redevelopment project and that the URA therefore did not apply. Transcripts of these statements made in hearings are attached as **Exhibit 10.**

125. However, in communications with federal agencies— including the Environmental Protection Agency during the Environmental Justice review—Defendants affirmatively

-18-

represented that city, state, and federal relocation laws, *including the URA*, were required and were being followed. These statements were false and inconsistent with federal records.

126.   Defendants were not applying the URA at all, and the EPA relied on these misrepresentations in completing its federal oversight obligations.

127.   Defendants, acting through their counsel, submitted filings and made oral representations to the Hearing Officer and to the courts expressly stating that the URA was inapplicable, that the project involved "no federal funds," and that federal relocation laws did "not apply under any circumstances."

128.   These representations were material, relied upon by adjudicative bodies, and demonstrably false based on subsequently uncovered federal records.

129.   By misrepresenting the presence of federal financial assistance, Defendants manufactured the false premise upon which Plaintiff's administrative relocation denials were based.

130.   These falsehoods tainted the entire process, including the valuation hearings, relocation appeals, and judicial review—constituting fraud, fraudulent misrepresentation, and fraud on the court.

131.   As a direct and foreseeable result of Defendants' deception, Plaintiff was wrongfully denied relocation benefits mandated by federal law and suffered substantial financial harm, business destruction, and constitutional injury.

## FALSE STATEMENTS TO THE EPA AND MISREPRESENTATIONS IN THE ENVIRONMENTAL JUSTICE PROCESS

132. In 2015–2016, as part of the federal environmental review process for the proposed NGA West facility, the Environmental Protection Agency ("EPA") reviewed the Draft Environmental Impact Statement ("Draft EIS") and later the Final EIS.

133. As part of this process, the EPA was required to evaluate whether the redevelopment would cause disproportionate impacts on low-income or minority populations under Presidential Executive Order 12898 ("Environmental Justice").

134. EPA concluded that displacement impacts were "mitigated" and "not disproportionately borne by minority or low-income residents," because EPA believed that uniform relocation assistance—including moving costs, re-establishment costs, replacement housing benefits, and advisory services—would be provided when such was not the case.

135. EPA's Environmental Justice determination was based on materially false statements, omissions, and misrepresentations by Defendants.

136. Had the EPA been told the truth—that the City had no intention of providing URA-mandated benefits—the federal review would have required supplemental analysis, additional mitigation measures, and potentially an adverse impact finding.

137. Defendants' false statements to EPA form part of the broader fraudulent scheme to (a) conceal federal financial involvement, (b) avoid URA compliance obligations, and (c) create an administrative record denying Plaintiff his statutory and constitutional protections.

138. The concealment of URA applicability from EPA not only tainted the federal environmental review, but also directly contributed to Plaintiff's harm: EPA's mistaken belief that URA protections were being provided meant that no federal intervention occurred on behalf of Plaintiff or the other displaced residents and business owners.

139. Defendants' conduct constitutes: (a) fraud and fraudulent concealment; (b) fraud on a federal agency, which is further evidence of fraud on the court when the same false narrative was later presented in Missouri administrative and judicial proceedings; and (c) intentional

-20-

deprivation of rights under 42 U.S.C. § 1983 by using false federal determinations as a shield while denying Plaintiff due process and equal protection under the law.

## FRAUD ON THE COURT

140. Fraud on the court is a distinct species of fraud involving conduct that subverts the integrity of the judicial process itself, including perjury, fabricated evidence, concealment of material facts, and deliberate deception of administrative tribunals, state courts, and federal courts by parties, government officials, or officers of the court.

141. This doctrine contains no statute of limitations and permits relief even decades after judgment, because courts retain inherent power to vacate judgments obtained by corruption or fraud.

142. During the condemnation, relocation, and administrative-review proceedings involving Plaintiff, Defendants—including the City of St. Louis, SLDC, LCRA, and Development Resource Partners ("DRP")—engaged in a coordinated misrepresentation campaign designed to mislead state tribunals, administrative officers, and reviewing bodies about the federal character of the NGA-West project.

143. In furtherance of this scheme, Defendants' counsel, acting as an officer of the court, submitted or endorsed statements in litigation that were knowingly false or made in reckless disregard of the truth, including representations that no federal funding had been received and that the URA was legally irrelevant.

144. These representations went to the core legal question before the proceedings and were essential to the rulings Defendants obtained and were detrimentally relied upon by all parties and the judges and hearing officer, all to Plaintiff's detriment.

145. This pattern of contradictory representations—telling EPA and federal environmental reviewers that URA applied, while telling state courts and administrative bodies that URA did not—was not an accident or misunderstanding. It was a deliberate, coordinated strategy to: Induce federal approval by promising compliance with URA standards, Block displaced owners from invoking those same rights, Prevent tribunals from applying the correct legal framework, and Reduce Defendants' financial exposure by unlawfully denying relocation benefits.

146. As a direct result of this fraud, the administrative record was falsified, the Commissioners' valuation process was tainted, the state-court review was corrupted, and Plaintiff was deprived of the relocation assistance, procedural rights, and compensation to which he was entitled under federal law.

147. The fraudulent conduct described above constitutes fraud on the court. It corrupted the judicial process at every level and renders the prior administrative and judicial determinations void or voidable.

148. Plaintiff seeks appropriate relief, including damages, equitable remedies, and all powers available to the Court to address judgments obtained through fraud on the court.

## SUMMARY OF DEFENDANTS' UNLAWFUL SCHEME

149. This case arises from a coordinated, multi-year scheme by the City of St. Louis, SLDC, LCRA, Development Resource Partners, and their counsel to conceal federal involvement in the NGA-West redevelopment project, to deny Plaintiff the federal relocation protections mandated by law, and to mislead federal agencies, state tribunals, and courts in order to accomplish the clearance of a predominantly Black neighborhood at minimal cost.

150.    From the outset, the NGA-West project involved substantial federal participation, including federally funded environmental assessments, EPA Brownfield/TBA grants, federal environmental-justice review, federal environmental remediation planning, and the planned transfer of more than 90 acres of condemned land to the United States for construction of the NGA installation.

151.    Federal law—including the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA")—is triggered when federal financial assistance is used, when a local agency acquires property on behalf of the federal government, or when property is acquired for transfer to a federal agency. All three triggers were present here.

152.    Defendants knew that federal environmental funds were being used in the project footprint, knew that the EPA's Brownfields program was paying for environmental work, and knew that EPA was conducting environmental justice review based on the assumption that federal relocation laws—including the URA—were being followed.

153.    These contradictory representations were not accidental.

154.    Defendants promised URA compliance to federal agencies to secure site approval while simultaneously denying URA rights on the ground to avoid the costs and obligations associated with federal relocation standards.

155.    As EPA records now show, every material representation made to administrative tribunals, Missouri state courts, and federal courts concerning federal funding, URA applicability, federal oversight, and the federal nature of the NGA West project was false.

156.    Defendants' scheme amounted to fraud on the court, fraud on a federal agency, and a coordinated deprivation of Plaintiff's constitutional and statutory rights.

157.    The scheme had clear discriminatory and retaliatory dimensions: Black residents received lower compensation, fewer benefits, and poorer treatment; Plaintiff—who advocated for

Black residents—was targeted for retaliation and denied all relocation assistance despite qualifying as a low-income displaced business.

158. The administrative relocation determination itself was tainted by fraud.

159. The Hearing Officer's findings and conclusions were premised on demonstrably false legal and factual assumptions supplied by Defendants, including that (a) no federal funds or federal involvement existed, (b) the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA") was categorically inapplicable, and (c) Missouri Revised Statute § 523.205 was the sole governing law.

160. Those premises were false.

161. Defendants intentionally withheld from the Hearing Officer the existence and operative effect of St. Louis Ordinance 62481 § 24.3, which independently mandates relocation benefits and expressly requires application of the URA even where property is acquired using solely state or local funds.

162. Defendants also withheld or concealed EPA environmental documentation and federal involvement demonstrating that URA standards applied.

163. As a result, the Hearing Officer adopted findings that mirrored Defendants' false narrative, repeated their legal misstatements verbatim, and entered a determination denying Plaintiff mandatory relocation benefits on a legally impossible theory—namely, that no relocation law applied at all.

164. The administrative process therefore functioned not as an independent adjudication, but as an instrument through which Defendants' concealment and misrepresentations were laundered into an official decision, corrupting the adjudicative process itself.

165. The fraud was compounded when the Hearing Officer's decision was later relied upon by Defendants in subsequent proceedings as purported proof that relocation law had been correctly applied.

-24-

166. In reality, the decision was procured through Defendants' suppression of controlling City law, misrepresentation of federal involvement, and presentation of a false legal framework under which Plaintiff could receive relocation compensation only if he complied with discretionary bid procedures—procedures that have no legal relevance when mandatory relocation entitlements are triggered by Ordinance 62481, § 523.205, and the URA.

167. The administrative findings therefore cannot serve as a lawful basis for denying Plaintiff's claims and instead constitute further evidence of fraud on the tribunal.

168. The administrative decision attached as **Exhibit 11** demonstrates that the Hearing Officer's conclusions were based entirely on Defendants' false representations that no federal funds were involved and that only § 523.205 applied, while omitting any analysis of Ordinance 62481 § 24.3 or its mandatory URA provisions.

169. All of these actions were connected, intentional, and performed under color of state law. Together, they form a single unlawful conspiracy to (a) conceal federal involvement, (b) evade federal relocation requirements, (c) suppress challenges to the City's actions, (d) mislead federal and state decision-makers, and (e) deprive Plaintiff of rights guaranteed by the Constitution and the URA.

## STATUTE OF LIMITATIONS TOLLED BY FRAUD, CONCEALMENT, AND FRAUD ON THE COURT

170. The statutes of limitations for Plaintiff's federal and state claims are tolled under multiple, independent doctrines, including fraudulent concealment, equitable tolling, the discovery rule, the continuing-violation doctrine, and the doctrine of fraud on the court.

171.    Defendants concealed the existence of federal financial assistance, federal environmental involvement, federal Brownfield funding, EPA oversight, and federal relocation-law applicability throughout the condemnation, relocation, and administrative-review processes.

172.    Plaintiff could not have reasonably discovered the truth because Defendants (a) denied federal involvement in formal rulings; (b) withheld federal documents; and (c) made false and misleading statements concerning federal funding and URA applicability to administrative tribunals, Missouri state courts, federal courts, and Plaintiff himself.

173.    Defendants repeatedly represented—to Plaintiff, to the LCRA Hearing Officer, in federal court proceedings, and in Missouri state courts—that the NGA project "received no federal funds" and that the federal Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA") "did not apply."

174.    These representations were foundational to every adverse ruling issued against Plaintiff.

175.    Federal records—including the EPA Draft Environmental Impact Statement, the EPA Record of Decision, federal Brownfield Targeted Assessment ("TBA") files, and related federal coordination documents—revealed that Defendants' repeated statements denying federal involvement in the NGA land-assembly process were false, and that federal financial assistance was in fact received.

176.    Plaintiff did not discover these records, and could not reasonably have discovered their significance, until recently because Defendants affirmatively and repeatedly misrepresented the absence of federal funding in administrative hearings and judicial proceedings, and withheld or failed to disclose federal environmental documentation within their possession, custody, or control.

177.    Plaintiff had no reason to suspect the existence or relevance of these federal records because Defendants, through sworn statements and official determinations, consistently

-26-

represented that the NGA project involved no federal funds and that federal relocation law did not apply.

178. Defendants' concealment was self-concealing in nature because Defendants simultaneously controlled the administrative record, the relocation correspondence, and the legal positions presented to tribunals, leaving Plaintiff without any independent access to contradictory federal documentation.

179. Fraudulent concealment tolls all limitations periods where defendants: (a) knew the facts, (b) concealed those facts, and (c) caused the plaintiff to delay filing.

180. Each of these elements is satisfied here. Defendants had actual knowledge of federal involvement; they actively concealed that involvement; and Plaintiff's ability to file suit was delayed because he reasonably relied on Defendants' false statements.

181. The doctrine of fraud on the court independently eliminates all statute-of-limitations defenses.

182. Fraud on the court—by attorneys, municipal officials, and agency representatives—vitiates prior judgments and tolls limitations indefinitely because it corrupts the judicial process itself.

183. Defendants' two-track deception (telling EPA that URA applied while telling courts it did not) subverted judicial proceedings at every level.

184. The violation is also continuing in nature.

185. The effects of Defendants' fraud—including the denial of relocation benefits, the tainted administrative record, the corrupted judicial review, and the continuing concealment of federal involvement—extend to the present day, and therefore the continuing-violation doctrine applies.

186.    Under these doctrines, the limitations period did not begin to run until Plaintiff discovered, or reasonably could have discovered, the federal environmental records, EPA funding documents, and contradictory statements made to federal agencies.

187.    Plaintiff's claims are therefore timely under federal and Missouri law.

## DISCOVERY OF CONCEALED FACTS AND ACCRUAL OF CLAIMS

188.    Plaintiff did not discover—and could not reasonably have discovered—the existence of federal financial assistance, EPA-funded environmental work, or Defendants' contradictory representations to federal agencies until September 2025, when Plaintiff first located federal environmental records relating to the NGA site during online research, including a Tetra Tech document referencing Phase II environmental work within the project area.

189.    Plaintiff located these federal environmental records only after using recently developed artificial-intelligence–assisted research tools capable of identifying and cross-referencing environmental assessment documents across multiple government databases and contractor archives.

190.    Prior to the availability of such tools, the relevant EPA, NGA, and contractor records were not reasonably discoverable through conventional search methods because they were dispersed across separate technical reports, environmental archives, and contractor documentation that were not indexed together in ordinary public searches.

191.    Plaintiff discovered that a photograph included in the Tetra Tech federal environmental testing materials depicts a fallen slab of granite inside Plaintiff's building.

192.    The photograph appears in the materials attached as Exhibit 6 and corresponds to environmental testing conducted by Tetra Tech as part of EPA-funded assessment activities.

193.  This visual evidence confirms that federal environmental testing was conducted within Plaintiff's building itself, not merely in the surrounding neighborhood or on exterior parcels.

194.  Plaintiff first discovered the photograph depicting the fallen granite slab in September 2025.

195.  From 2016 through 2021, Plaintiff reasonably relied on Defendants' sworn statements in administrative hearings, judicial proceedings, and relocation determinations—statements made by attorneys, City officials, and relocation administrators—that "no federal funds were involved" and that the URA "did not apply."

196.  These were official government representations made in formal adjudicative settings, creating justified reliance.

197.  At no point during Plaintiff's relocation proceedings did Defendants produce, cite, or disclose the EPA Draft Environmental Impact Statement ("Draft EIS"), the EPA Record of Decision ("ROD"), Brownfields funding records, or federal coordination materials—despite having possession, custody, and control of them.

198.  Plaintiff had no reasonable ability to discover this deception earlier because Defendants: (a) affirmatively misrepresented the absence of federal funding; (b) withheld federal environmental and coordination documents in their possession, custody, and control; (c) repeatedly asserted in official proceedings that the project was "entirely locally funded"; (d) made these representations as attorneys, government officials, and officers of the court; and (e) created an administrative record that concealed federal involvement. As a result, the true facts were not reasonably discoverable through ordinary diligence until Plaintiff later located the concealed federal records through modern research tools in September 2025.

199. In September 2025, Plaintiff first obtained the EPA environmental documents revealing: (a) federal Brownfield/Targeted Brownfield Assessment ("TBA") funding; (b) EPA-supported environmental sampling within the NGA footprint; and (c) Defendants' affirmative representations to federal agencies that relocation and displacement associated with the project were governed by the URA.

200. Only upon obtaining these federal records was Plaintiff able to uncover Defendants' dual-track deception: Defendants told EPA, NGA, and federal agencies that URA protections applied, while simultaneously telling Plaintiff and Missouri tribunals that URA "did not apply" because "no federal funds were used."

201. Fraudulent concealment tolls limitations where defendants: (1) knew the true facts, (2) concealed those facts, and (3) caused delay in filing by inducing reasonable reliance.

202. The facts alleged herein satisfy each of these elements.

203. Plaintiff exercised reasonable diligence in attempting to investigate the project and Defendants' representations, however, because the relevant federal environmental records were dispersed across technical reports and contractor documentation not readily identifiable through conventional research methods, Plaintiff could not reasonably discover the concealed federal involvement until the records were identified through modern artificial-intelligence–assisted research tools in September 2025.

204. For these reasons, the applicable federal and state statutes of limitations were tolled until Plaintiff discovered the concealed federal records in September 2025, making this Complaint timely.

205. Defendants' concealment extended not only to federal URA applicability but also to Plaintiff's rights under Ordinance 62481.

206. Defendants never disclosed that City law independently guaranteed Plaintiff relocation benefits in the absence of URA coverage.

-30-

207. Instead, Defendants' position—express and implied—was that only state relocation law applied to Plaintiff.

208. The concealment of both federal and local relocation entitlements further tolls all statutes of limitations under fraudulent-concealment and discovery-rule doctrines, because Plaintiff could not reasonably discover that Defendants had violated both tiers of protection built into the City's legal framework.

209. Plaintiff could not assert rights under Ordinance 62481 in state proceedings because Defendants affirmatively represented that only Missouri state relocation law applied.

210. Defendants created an administrative record stating the project was "entirely local" with "no federal funds."

211. Only upon discovering federal documents showing EPA involvement and Defendants' contradictory representations to federal agencies did Plaintiff realize that Defendants had concealed the applicability of BOTH tiers of protection contemplated by Ordinance 62481.

212. These facts provide the foundation for Plaintiff's unconstitutional-taking claim set forth in the Causes of Action below.

### COUNT I — VIOLATION OF 42 U.S.C. § 1983 (DUE PROCESS)

(Deprivation of Property, Fair Procedure, and Honest Government)

213. Plaintiff incorporates by reference paragraphs 1–210 as though fully set forth herein.

214. Plaintiff possessed protected property interests under the Fourteenth Amendment, including (a) his real property, (b) his long-standing business operations, (c) his rights to relocation benefits guaranteed under federal, state, and local law, and (d) his rights to a fair and truthful adjudicative process.

215. Defendants City of St. Louis, SLDC, LCRA, and DRP, acting under color of state law, deprived Plaintiff of his clearly established procedural due-process rights, including the right to accurate notice of applicable law, the right to truthful government representations, and the right to a fair hearing not infected by fraud, concealment, or fabricated premises by failing to provide relocation assistance benefits to Plaintiff.

216. Due process requires: (a) truthful disclosure of governing law, (b) a fair opportunity to be heard, (c) notice of rights and obligations, and (d) an adjudicative process free from deception. Defendants knowingly violated each of these requirements.

217. Defendants falsely asserted that the federal Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA") did not apply to the NGA project, despite actual knowledge that the project involved federal environmental funding, federal Brownfield/TBA assistance, federal environmental-justice review, and the planned transfer of Plaintiff's property to a federal agency.

218. Defendants deprived Plaintiff of procedural due process by issuing a written relocation notice (Exhibit 1) that falsely described the governing law and omitted mandatory federal and City-law relocation protections.

219. A government cannot satisfy due process by providing notice that is materially false and designed to conceal statutory rights.

220. Defendants intentionally withheld federal documents, concealed federal financial assistance, and misrepresented material facts to Plaintiff and to adjudicative bodies, thereby preventing Plaintiff from invoking federally mandated relocation rights and procedural protections.

221. Defendants, acting through their counsel, repeatedly represented in hearings and filings that "no federal funds were involved" in the project and that the URA "did not apply under any circumstances."

222. These representations were false, material, and deprived Plaintiff of a fair and impartial adjudication.

223. Plaintiff's relocation appeal, valuation rights, and displacement protections were adjudicated on a fraudulent premise manufactured by Defendants.

224. A hearing conducted on a knowingly false legal framework cannot satisfy due-process requirements.

225. As a direct result of these misrepresentations, Plaintiff was denied required relocation notices, advisory services, business-reestablishment determinations, comparable-replacement-housing evaluations, low-income classification benefits, moving-expense payments, and other mandatory URA and state protections.

226. Defendants' conduct was intentional, deliberate, and undertaken pursuant to official policy or established custom—including the relocation policies implemented under the authority of SLDC Executive Director Otis Williams—designed to reduce compensation, minimize relocation obligations, and conceal federal involvement.

227. As a direct and proximate result of these due-process violations, Plaintiff suffered substantial economic harm, including destruction of his business, loss of property, loss of relocation benefits, litigation costs, and additional consequential losses.

228. Plaintiff also suffered emotional distress, humiliation, and constitutional injury.

229. In addition to Plaintiff's property interests in his real estate and business, Plaintiff possessed a state-created property interest in relocation benefits arising under St. Louis Ordinance 62481.

230. Ordinance 62481 mandates that any displaced person in a covered City project "will be entitled to receive" relocation payments and assistance, unless federal URA benefits apply, in which case URA protections govern.

231. This mandatory language creates a legitimate claim of entitlement protected by the Due Process Clause. See Exhibit 4 (Relocation Policy §§24.3–24.4)

232. A municipal ordinance that uses mandatory language ("will be entitled to receive") creates a property interest protected by the Fourteenth Amendment.

233. Defendants' intentional refusal to implement Ordinance 62481 therefore constitutes a deprivation of a state-created property interest actionable under 42 U.S.C. § 1983.

234. Plaintiff also possessed a state-created property interest in relocation benefits mandated by Missouri's relocation statute, RSMo § 523.205. This statute requires condemning authorities in redevelopment projects to provide relocation plans, notices, moving payments, business re-establishment payments, advisory services, and other minimum relocation benefits equivalent to the URA.

235. Defendants violated § 523.205 by denying Plaintiff every mandatory form of state relocation assistance, including required notices, relocation plan provisions, moving payments, and business re-establishment assistance.

236. This violation of a mandatory state entitlement constitutes an additional deprivation of property without due process of law.

237. Defendants violated Plaintiff's procedural due-process rights by entirely denying both categories of relocation protections contemplated by Ordinance 62481—federal URA benefits (if applicable) and City minimum benefits (if URA did not apply).

238. Under the City's own law, there is no lawful scenario in which a displaced person in Plaintiff's position receives zero relocation assistance.

239. Defendants nonetheless adopted exactly that position, without notice, hearing, or truthful explanation of the governing legal framework.

240. Defendants' refusal to apply either URA or Ordinance 62481, notwithstanding clear applicability of at least one of these frameworks, further demonstrates that the denial of

-34-

process and benefits was not a mere legal error but a deliberate policy to strip Plaintiff of a vested statutory entitlement created by law.

WHEREFORE, Plaintiff requests judgment against Defendants for compensatory damages, punitive damages, declaratory and injunctive relief, attorney's fees under 42 U.S.C. § 1988, and all other relief the Court deems just and proper.

### COUNT II — VIOLATION OF 42 U.S.C. § 1983 (EQUAL PROTECTION)

(Intentional Discrimination & Retaliatory Differential Treatment)

Against the City of St. Louis, SLDC, LCRA, DRP, Otis Williams (individual/official)

241. Plaintiff incorporates by reference paragraphs 1–238 as though fully set forth here.

242. The Equal Protection Clause prohibits the government from intentionally treating similarly situated individuals differently based on race, or in retaliation for protected advocacy undertaken in support of a racial group.

243. Defendants intentionally treated Black residents and business owners within the NGA redevelopment footprint less favorably than similarly situated white owners—providing significantly lower compensation, denying relocation benefits, and withholding advisory services that were granted to white commercial interests.

244. Plaintiff, although white, was similarly targeted because he associated with, advocated for, and actively supported the predominantly Black residents whose rights were being violated—bringing him within the protected scope of association-based equal protection and Title VI-coextensive constitutional protection.

-35-

245. Plaintiff openly challenged the City's discriminatory practices, assisted Black residents with relocation objections, and authored a detailed memorandum to Congressman William Lacy Clay documenting the City's disparate treatment of Black homeowners and its refusal to follow URA and Title VI obligations. A copy of the letter to Congressman Clay can be seen as Exhibit 9.

246. Defendants—including relocation officials, SLDC leadership, and LCRA agents, —were aware of Plaintiff's advocacy, discussed it internally, and viewed Plaintiff as an obstacle to the City's rapid clearance of the NGA footprint.

247. In retaliation for Plaintiff's advocacy on behalf of Black residents, Defendants intentionally singled him out for adverse treatment by:

a.      Stripping him of relocation eligibility entirely;

b.      Denying all advisory services required under federal, state, and local relocation law;

c.      Refusing to inspect his business inventory or determine re-establishment expenses;

d.      Misrepresenting legal standards to deprive him of rights available to other displaced owners; and

e.      Submitting knowingly false statements to administrative tribunals to ensure Plaintiff received less than the minimum assistance required by law.

248. Defendants did not treat other similarly situated displaced owners—particularly those who were not advocating for Black residents—in such an extreme and punitive manner.

249. Defendants implemented a pattern and practice of providing inferior relocation benefits and valuation outcomes to Black residents and Black-owned businesses during the NGA clearance.

250. Public records reflect stark disparities: A white commercial owner received approximately $29 million, Black families and Black-owned businesses received minimal assistance, Plaintiff—who supported Black residents—received nothing at all.

251. Upon information and belief, multiple white-owned commercial properties within the NGA footprint received URA-level relocation advisory services, business re-establishment evaluations, and negotiated compensation packages exceeding seven figures, while Plaintiff and Black-owned businesses received no such services or evaluations.

252. These disparities were known to SLDC leadership (including Otis Williams), to LCRA officials, and to the City Attorney's office; and no one took action to correct the problem.

253. Defendant Williams, as the final policymaker for SLDC, ratified these disparities by refusing to adjust relocation practices, ignoring complaints from residents, and publicly maintaining that the City owed no federal relocation obligations.

254. The City's discriminatory treatment of Black residents and retaliatory targeting of Plaintiff were intentional, motivated by discriminatory purpose, and executed through official policy, practice, and custom, satisfying the requirements of *Monell.*

255. Defendants, acting through their counsel, knowingly submitted false statements to the relocation appeals process and judicial review in order to deprive Plaintiff—a vocal advocate for Black residents—of all relocation rights.

256. These actions directly furthered the discriminatory and retaliatory scheme by ensuring Plaintiff would receive no relief and that the City's disparate treatment of Black residents would remain concealed.

257. Defendants' actions—both individually and collectively—constitute intentional discrimination and retaliatory disparate treatment in violation of the Equal Protection Clause of the Fourteenth Amendment.

258. Defendants acted under color of state law and with deliberate indifference to Plaintiff's constitutional rights.

259. As a direct and proximate result of Defendants' equal-protection violations, Plaintiff suffered the following damages: (a) destruction of his business; (b) loss of property; (c) loss of relocation benefits; (d) emotional distress; and (e) humiliation; (f) constitutional injury; and (g) economic loss exceeding millions of dollars.

WHEREFORE, Plaintiff requests judgment against all Defendants for: Compensatory damages; Punitive damages against all individual defendants; Declaratory relief; Injunctive relief; Attorney's fees under 42 U.S.C. § 1988; And all other relief the Court deems just and proper.

## COUNT III — VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

260. Plaintiff incorporates by reference paragraphs 1–257 as though fully set forth herein.

A. Title VI Applies Because Defendants Received Federal Financial Assistance

261. Title VI, 42 U.S.C. § 2000d, prohibits discrimination on the basis of race in any "program or activity receiving Federal financial assistance."

262. The NGA-West redevelopment project—including property acquisition, relocation determinations, environmental review, and site preparation—was a *federally assisted program* because: a. EPA Region 7 provided federally funded Targeted Brownfields Assessment (TBA) services in the NGA footprint; b. EPA funded environmental-justice review, hazardous-substance assessment, and soil and groundwater sampling; c. Federal environmental oversight was integrated

-38-

into the project through the Draft EIS and ROD; d. State reimbursement of acquisition and relocation costs was authorized under Missouri House Bill 514; e. The project was undertaken for transfer of land to a federal agency (NGA), which independently constitutes federal participation; and f. The City represented to EPA that federal relocation laws applied, confirming the federal funding nexus.

263. Because federal financial assistance existed, the City of St. Louis, SLDC, LCRA, and DRP were bound by Title VI's prohibition on racial discrimination.

264. Black residents and Black-owned businesses in the NGA footprint were intentionally treated less favorably than similarly situated white individuals and businesses in every key relocation category, including: a. Relocation advisory services; b. Comparable-replacement-housing determinations; c. Business re-establishment benefits; d. Moving expenses; e. Appraisal and valuation practices; f. Timing, assistance, and outreach; and g. Appeals and grievance rights.

265. Black families routinely received minimal or no relocation assistance, while white commercial entities—including one similarly situated white owner—received compensation exceeding $29 million.

266. These disparities were neither random nor accidental.

267. They reflected intentional decisions by City officials, SLDC leadership, LCRA agents, and DRP staff who were responsible for administering federally mandated relocation benefits.

268. Defendants intentionally deceived the EPA by asserting that all displaced individuals—including Black residents—would receive relocation assistance "in accordance with all applicable federal, state, and local law," knowing this was false.

269. These false statements were designed to: a. Conceal that Black residents were not receiving URA-level protections; b. Avoid federal scrutiny over disparate impacts on a *majority-*

*Black neighborhood*; c. Expedite land clearance for NGA at the lowest possible cost; and d. Suppress complaints about racial disparities.

270. EPA's Environmental Justice findings—based entirely on Defendants' false assurances—incorrectly concluded that Black residents were not disproportionately harmed, enabling Defendants to continue their discriminatory practices without federal intervention.

271. Although Plaintiff is white, Title VI protects individuals who suffer adverse treatment due to association with a protected racial group or advocacy on behalf of minority victims.

272. Plaintiff associated with and advocated for Black residents who were being denied relocation benefits. His memorandum to Congressman Clay specifically demanded fair treatment for Black homeowners and exposed the City's discriminatory practices.

273. In retaliation for this advocacy, Defendants: a. Stripped Plaintiff of all relocation benefits; b. Refused every form of relocation assistance; c. Provided no advisory services; d. Used fraudulent statements to deny all rights; and e. Treated Plaintiff more harshly than similarly situated non-advocating owners.

274. This retaliation constitutes intentional discrimination prohibited by Title VI, which protects individuals advocating against racial discrimination.

275. Defendants' actions were intentional, purposeful, and motivated by racial animus and retaliatory desire to silence Plaintiff's advocacy.

276. Defendants acted with deliberate indifference to the rights of Black residents and to Plaintiff's rights under Title VI.

277. Their discriminatory treatment occurred as part of official policies, customs, and practices adopted and enforced by SLDC, LCRA, and City leadership.

278. As a direct and proximate result of Defendants' Title VI violations, Plaintiff suffered: Loss of relocation benefits; Destruction of his business; Loss of property; Economic

losses exceeding millions of dollars; Emotional distress and humiliation; Constitutional injury; and Ongoing harm caused by the City's intentional racial discrimination and retaliation.

WHEREFORE, Plaintiff requests judgment against the City of St. Louis, SLDC, LCRA, and DRP for: Compensatory damages; Punitive damages (as available under Title VI through §1983); Declaratory relief; Injunctive relief; Attorney's fees under 42 U.S.C. § 1988; All other relief the Court deems just and proper.

## COUNT IV — VIOLATION OF TITLE VI (RETALIATION)

### (42 U.S.C. § 2000d et seq. )

Against the City of St. Louis, SLDC, LCRA, DRP, and Otis Williams (official capacity)

279.   Plaintiff incorporates by reference paragraphs 1–276 as though fully set forth herein.

280.   Title VI prohibits retaliation against any individual who opposes, reports, or assists others in opposing racial discrimination in a program or activity receiving federal financial assistance.

281.   It is well established that Title VI protects not only direct victims of racial discrimination but also those who advocate for them, assist them, or complain about discriminatory practices.

282.   Courts routinely hold that advocacy on behalf of a protected racial group is protected activity under Title VI.

283.   Title VI applies here because the NGA redevelopment project received federal financial assistance, including EPA Brownfield/TBA funding, federal environmental-review

funding, and federal reimbursement mechanisms described in the Draft EIS, ROD, and public financing documents.

284. Plaintiff engaged in protected activity under Title VI by: a. Assisting and advising displaced Black residents and business owners on their relocation rights;

b. Investigating and documenting racial disparities in relocation treatment;

c. Complaining to SLDC, LCRA, DRP, and City officials about those disparities;

d. Authoring and submitting a detailed memorandum to Congressman William Lacy Clay documenting Title VI and URA violations against Black residents;

e. Publicly opposing the discriminatory relocation practices implemented by the City.

285. Plaintiff's advocacy was directly race-based—he sought equal treatment for displaced African-American residents whom the City was systematically undercompensating and excluding from relocation assistance.

286. Plaintiff's protected advocacy was known to all Defendants and their counsel, including SLDC leadership, LCRA officials, DRP relocation staff.

287. In retaliation for Plaintiff's protected activity, Defendants intentionally imposed severe adverse actions, including:

a. Stripping Plaintiff of relocation eligibility despite his clear legal qualification as both a business and residential occupant; b. Refusing to conduct any relocation interview, needs assessment, inventory inspection, or advisory services—rights provided to others; c. Misrepresenting relocation law (claiming URA did not apply) in order to deny Plaintiff any protections; d. Using false statements before administrative tribunals to ensure Plaintiff received no relocation benefits; e. Providing drastically lower compensation and refusing to evaluate business losses; f. Triggering the FBI intimidation meeting, shortly after Plaintiff complained to

Congressman Clay, to deter further advocacy; g. Treating Plaintiff more harshly than any similarly situated displaced owner who did not advocate for Black residents.

288. Each of these actions constitutes a materially adverse action under Title VI because they would deter a reasonable person from continuing to challenge racial discrimination in a federally assisted program.

289. A close temporal proximity exists between Plaintiff's advocacy and the retaliatory actions: Plaintiff complained to City officials THEN shortly afterward, his relocation rights were stripped. Plaintiff submitted the memorandum to Congressman Clay - within days, he was summoned to the FBI for an intimidating interrogation.

290. Plaintiff continued advocating for Black residents - Defendants, acting through their counsel, escalated misrepresentations and legal attacks aimed solely at Plaintiff.

291. The pattern, timing, and nature of the retaliation demonstrate a direct causal link between Plaintiff's advocacy for Black residents and Defendants' adverse actions.

292. The retaliation was intentional, malicious, and designed to silence Plaintiff's advocacy and to suppress further complaints regarding Title VI violations.

293. As a direct and proximate result of Defendants' Title VI retaliation, Plaintiff suffered: Loss of his business; Loss of property; Loss of relocation benefits and statutory entitlements; Emotional distress and humiliation; Damage to reputation; Significant economic harm exceeding millions of dollars.

294. Plaintiff is entitled to compensatory and punitive damages, declaratory relief, injunctive relief, and all other remedies available under Title VI and 42 U.S.C. § 1988.

WHEREFORE, PLAINTIFF RESPECTFULLY REQUESTS JUDGEMENT AGAINST DEFENDANTS FOR: Compensatory damages; Punitive damages (against individual actors as

-43-

permitted); Declaratory judgment stating that Defendants violated Title VI through retaliation; Injunctive relief; Attorney's fees under 42 U.S.C. § 1988; Any other relief the Court deems just and proper.

## COUNT V — UNCONSTITUTIONAL TAKING

(Missouri Constitution Art. I §§ 26 & 28; RSMo §§ 523.271–523.274)

Against the City of St. Louis and LCRA

295. Plaintiff incorporates paragraphs 1–292 as though fully set forth herein.

296. Article I, § 26 of the Missouri Constitution authorizes the taking of private property only for a public use and only upon payment of just compensation.

297. Article I, § 28 further prohibits the taking of private property for private use or for purposes outside the constitutional authority of the condemning entity.

298. Where a municipality exercises eminent-domain authority, Missouri law requires strict compliance with all statutory conditions governing condemnation, including relocation and compensation frameworks enacted to ensure that displaced persons do not suffer disproportionate injury as a result of public projects.

299. Defendants acquired Plaintiff's property as part of a coordinated effort to assemble approximately 97 acres of land for transfer to the United States Government for construction of the National Geospatial-Intelligence Agency ("NGA") West facility.

300. Acting as a local acquisition agent for a federal project is lawful and expressly contemplated under the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA"), 42 U.S.C. § 4601 et seq., which governs acquisitions carried out by state or local entities on behalf of federal agencies or with federal financial assistance.

301. When a local government acquires property for a federal purpose, the URA mandates that displaced persons receive relocation payments, advisory services, business re-establishment compensation, and comparable replacement housing assistance as a condition of lawful condemnation and just compensation.

302. By acquiring Plaintiff's property for transfer to a federal agency, and by participating in federally funded environmental review and site-preparation activities, Defendants triggered the mandatory protections of the URA and the relocation standards incorporated into Missouri and City law.

303. Although Defendants acted as acquisition agents for a federal project, they falsely asserted—throughout administrative proceedings and judicial review—that the project involved "no federal funds" and that the URA did not apply under any circumstances.

304. These representations were false. Federal environmental funding, federal environmental-justice review, and the planned federal transfer of the assembled land were integral to the project.

305. By denying the applicability of the URA while simultaneously acting in a federal-acquisition capacity, Defendants evaded mandatory relocation and compensation obligations that form part of "just compensation" under Missouri law.

306. "Just compensation" under Article I, § 26 of the Missouri Constitution includes not only fair market value of the property taken, but also compliance with mandatory statutory relocation and displacement protections enacted to mitigate the harm of condemnation. See RSMo § 523.205; Ordinance 62481.

307. Defendants unlawfully denied Plaintiff relocation benefits exceeding $2,000,000 that he was entitled to receive under the URA, Missouri relocation statutes, and the City's own Relocation Policy.

308.    Instead, Defendants provided Plaintiff approximately $70,000—less than five percent of the compensation required under applicable law—by misrepresenting the governing legal framework and suppressing federal involvement.

309.    A taking accomplished by concealing the applicability of mandatory relocation law and denying statutorily required compensation cannot satisfy the Missouri Constitution's requirement of just compensation.

310.    Article I, § 28 prohibits the taking of private property for private use or for purposes that are pretextual or beyond the constitutional authority of the condemning entity.

311.    Defendants publicly justified the taking of Plaintiff's property as a City redevelopment project, while in reality the sole purpose of the acquisition was to assemble and transfer land to the United States Government for exclusive federal use.

312.    Even where condemnation for a federal project is permissible, a municipality may not disguise a federal-purpose taking as a local redevelopment project in order to evade mandatory compensation and relocation obligations.

313.    The use of City condemnation authority to acquire property for a federal agency, while denying the statutory protections that accompany such acquisitions, constitutes an unconstitutional misuse of eminent-domain power under Article I, § 28.

314.    As a direct and proximate result of Defendants' unconstitutional taking, Plaintiff suffered: Loss of his real property and residence, Destruction of his long-standing business, Denial of mandatory relocation benefits exceeding $2,000,000, Severe economic loss, Emotional distress and constitutional injury.

315.    Plaintiff is entitled to declaratory relief, just compensation, damages for loss of business and statutory entitlements, and all other relief necessary to remedy Defendants' constitutional violations.

WHEREFORE, Plaintiff requests judgment against Defendants City of St. Louis and LCRA for: a. A declaration that the taking was unconstitutional under Article I, §§ 26 and 28 of the Missouri Constitution; b. Just compensation in an amount to be determined at trial; c. Damages for loss of business and denied relocation benefits; d. Equitable relief restoring Plaintiff's statutory rights; e. Attorney's fees and costs as permitted by law; and f. Any other relief the Court deems just and proper.

## COUNT VI — FRAUDULENT MISREPRESENTATION

Against the City of St. Louis, SLDC, LCRA, DRP, and Otis Williams (individual/official capacity)

316. Plaintiff incorporates by reference paragraphs 1–313 as though fully set forth herein.

317. Defendants knowingly made false statements of material fact to Plaintiff concerning the applicability of federal relocation law, the presence of federal financial assistance, and the governing legal standards that applied to the NGA-West acquisition project.

318. Specifically, Defendants repeatedly represented—verbally, in writing, and in official proceedings—that: 1.) "No federal funds were used" in the NGA-West project; 2.) The URA "does not apply under any circumstances"; 3.) Plaintiff was not entitled to relocation benefits available under federal law; and 4.) The project was "entirely local" in nature.

319. These misrepresentations were made beginning in 2016 through at least 2021, by DRP relocation staff, SLDC officials, LCRA officials, and Defendants' counsel, in written correspondence, administrative hearings, court filings, and sworn oral argument.

320.    Each of these statements was false when made. Defendants possessed actual knowledge that the project involved: EPA Targeted Brownfields Assessment ("TBA") federal funding; EPA-funded environmental review and environmental justice analysis; Federal reimbursement mechanisms authorized under Missouri House Bill 514, and; The federal purpose and federal transfer of the assembled land to the National Geospatial-Intelligence Agency.

321.    Defendants made these misrepresentations with the intent to deceive Plaintiff and to induce him to: 1.) Forego relocation benefits to which he was legally entitled, 2.) Accept dramatically undervalued compensation, 3.) Abandon his objections and challenges to discriminatory treatment, 4.) Participate in relocation proceedings rigged against him, and 5.) Proceed through administrative and judicial processes without asserting federal rights.

322.    Defendants, acting through their counsel, made these representations to Plaintiff and to tribunals with full knowledge of their falsity.

323.    These representations were intended to create a false legal foundation for denying Plaintiff all relocation benefits.

324.    Defendant Otis Williams and SLDC officials also made public and private statements assuring Plaintiff that "no federal money" was used, despite being in possession of environmental documents, funding communications, and federal coordination records showing the opposite.

325.    Plaintiff reasonably relied on the Defendants' representations because: They were made by government officials charged with administering relocation law; They were presented as authoritative legal determinations; They were repeated throughout administrative hearings and judicial filings; No federal documents contradicting these statements were disclosed to Plaintiff during any stage of the process; and Defendants' counsel's statements were made in formal legal settings in their capacity as an officer of the court.

326.   Plaintiff relied on these statements in pursuing relocation remedies, responding to administrative decisions, preparing for hearings, and assessing his legal obligations and rights—only later discovering that Defendants had simultaneously been telling federal agencies the exact opposite.

327.   As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff suffered substantial damages, including: (a) Loss of relocation benefits valued at over $2,000,000; (b) Destruction of his business and equipment; (c) Loss of his property and personal residence; (d) Loss of eligibility for low-income and re-establishment payments; (e) Loss of advisory services; (f) Attorney's fees and litigation costs; (g) Emotional distress and humiliation; (h) additional consequential and economic losses.

328.   Defendants' conduct constitutes actionable fraud under Missouri law because it involved: (1) false representations of material fact concerning the presence of federal funding, the applicability of the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA"), and Plaintiff's legal entitlement to relocation benefits; (2) the falsity of those representations; (3) the materiality of those representations to Plaintiff's relocation rights, compensation, and legal strategy; (4) Defendants' knowledge that the representations were false, or reckless disregard for their truth; (5) Defendants' intent that Plaintiff act upon those representations by foregoing federal relocation benefits, abandoning objections, and accepting reduced compensation; (6) Plaintiff's ignorance of the falsity of the representations; (7) Plaintiff's actual reliance on the representations in pursuing relocation proceedings and judicial review; (8) Plaintiff's right to rely on representations made by government officials and officers of the court concerning applicable law and facts; and (9) resulting damages, including loss of more than $2,000,000 in relocation benefits, destruction of Plaintiff's business, loss of property, litigation costs, and consequential economic harm.

329. Defendants acted with malice, oppression, and conscious disregard for Plaintiff's rights.

330. Defendants' conduct was willful, intentional, and part of a larger scheme to: Conceal federal involvement; Evade federal relocation obligations; Reduce compensation for displaced residents; Silence Plaintiff's advocacy; And secure clearance of the NGA site at the lowest possible cost.

331. Plaintiff therefore avers that punitive damages are warranted to punish Defendants' misconduct and deter similar unlawful conduct in future redevelopment projects.

WHEREFORE, Plaintiff requests judgment against Defendants for: Compensatory damages; Punitive damages; Consequential and special damages; Pre- and post-judgment interest; Costs of suit; and any other relief the Court deems just and proper.

## COUNT VII — FRAUD ON THE COURT

(Against the City of St. Louis, SLDC, LCRA, and DRP)

(Fraud on Administrative Tribunals, Missouri State Courts, and Federal Courts;
Deception by Officers of the Court; Corruption of the Adjudicative Process)

332. Plaintiff incorporates by reference paragraphs 1–329 as though fully set forth herein.

333. Fraud on the court is a distinct and extreme form of fraud, consisting of conduct that "subverts the integrity of the judicial process itself," including perjury, fabricated evidence, deliberate deception of tribunals, and misconduct by an officer of the court.

-50-

334.    Fraud on the court is not subject to any statute of limitations. Fed. R. Civ. P. 60(d) (3) ("the court may set aside a judgment for fraud on the court at any time").

335.    Defendants—including the City of St. Louis, SLDC, LCRA, and DRP—acting through their counsel, engaged in a multi-year, coordinated pattern of deception in judicial and administrative proceedings regarding Plaintiff's relocation rights.

336.    In relocation appeals, condemnation-related hearings, and judicial review, Defendants repeatedly and affirmatively represented that: "No federal funds were used" in the NGA project; The federal Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA") did not apply; The NGA site was a "purely local project" involving "only City funds".

337.    These representations were false, and Defendants knew they were false when made.

338.    At the time these representations were being presented to tribunals, Defendants were simultaneously: Receiving EPA-funded Targeted Brownfield Assessments; Cooperating in federally funded environmental sampling and hazardous-substance assessments; Participating in the federal Environmental Justice review; Submitting information to EPA stating that URA applied and would be followed; Planning to transfer the land to a federal agency (NGA), constituting a federal-purpose taking.

339.    The EPA Draft EIS, EPA Record of Decision, Brownfield funding records, and federal coordination files all contradict the narrative Defendants presented to courts.

340.    These false statements were repeatedly offered by Defendants' attorneys, acting as officers of the court, during formal hearings, filings, valuation proceedings, and judicial review— conduct that directly corrupted the adjudicative process.

341.    Defendants possessed, but never disclosed, critical federal documents including: EPA Draft Environmental Impact Statement (EIS); EPA Record of Decision (ROD); Federal

TBA/Brownfield funding records; NEPA-related environmental assessments; Federal coordination memoranda; Federal reimbursement authorizations tied to HB 514 and Ordinance 70074

342. None of these materials were provided during Plaintiff's: Relocation advisory process; Relocation appeal; Condemnation valuation proceedings; Judicial review in Missouri circuit courts; Communications with relocation officials.

343. Instead, Defendants affirmatively created an administrative record that falsely stated the NGA project received no federal financial assistance and that URA did not apply under any circumstances.

344. Defendants' actions were not inadvertent errors or misunderstandings. They were part of a dual-track deception strategy:

Track 1: To Federal Agencies - Represent that URA protections applied; Represent that relocation would be provided "in accordance with all applicable federal, state, and local law." Ensure EPA issued a "no disproportionate impact" finding for the majority-Black neighborhood.

Track 2: To Plaintiff and Courts - Claim the project used "no federal funds." Assert URA "did not apply" under any circumstances. Deny Plaintiff all relocation benefits and strip him of legal protections.

345. The purpose of this deception was to: a. Obtain federal approval for NGA site selection; b. Avoid federal relocation obligations (URA) that would require substantial compensation; c. Suppress racial-discrimination concerns; d. Wrongfully deny Plaintiff relocation benefits and due process; e. Secure adverse judgments against Plaintiff based on a manufactured legal premise.

346. The false legal framework presented to tribunals—that the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA") did not apply and that Missouri Revised Statute § 523.205 was the sole governing law—was not created for litigation.

-52-

347. It originated in Defendants' November 7, 2016 written relocation offer to Plaintiff (Exhibit 1), and was later recycled verbatim in administrative hearings and judicial proceedings.

348. This demonstrates a premeditated, institutionalized deception rather than a good-faith legal dispute.

349. Every stage of Plaintiff's relocation and condemnation proceedings was corrupted by Defendants' fraudulent misrepresentations.

350. The fraud affected: The LCRA relocation determination; The relocation appeals hearing; The Commissioner's valuation process; Judicial review in Missouri state courts; Administrative findings relying on the "no federal funds" lie.

351. Decisions rendered under these false premises are void or voidable because they were procured through fraud on the court.

352. The deception prevented tribunals from applying the correct legal standard, deprived Plaintiff of substantive rights, and resulted in the loss of relocation benefits worth more than $2,000,000, while Defendants awarded Plaintiff approximately $79,000—a disparity created by fraud, not law.

353. As a direct and foreseeable result of Defendants' fraud on the court, Plaintiff suffered: Wrongful denial of relocation benefits; Loss of business valued in the millions; Loss of property; Emotional distress and humiliation; Corrupted judicial outcomes; Constitutional injury under the Fifth and Fourteenth Amendments.

354. Because fraud on the court tolls all statutes of limitations, Defendants cannot rely on any timeliness defense.

WHEREFORE, Plaintiff respectfully requests: a. A declaration that Defendants committed fraud on the court; b. An order voiding or vacating relocation and valuation determinations procured by fraud; c. Compensatory damages; d. Punitive damages against individual defendants; e. Equitable

relief restoring Plaintiff's legal rights; f. Attorney's fees under 42 U.S.C. § 1988; g. Any further relief the Court deems just and proper.

## COUNT VIII — FRAUDULENT CONCEALMENT

(Against the City of St. Louis, SLDC, LCRA, DRP, and Otis Williams)

355. Plaintiff incorporates by reference paragraphs 1–352 as though fully set forth herein.

356. Fraudulent concealment occurs where a defendant: (a) possessed material facts; (b) concealed those facts through affirmative acts or misrepresentations; (c) intended that plaintiff rely on the concealment; (d) plaintiff reasonably relied on the concealment; and (e) the concealment prevented plaintiff from discovering his claim within the limitations period.

357. Fraudulent concealment applies where a defendant affirmatively misrepresents the legal framework, or suppresses documents that would reveal the truth.

358. Defendants City of St. Louis, SLDC, LCRA, DRP, and Otis Williams concealed the operative effect of the City's own relocation ordinance.

359. Ordinance 62481 § 24.3 ("Applicability") expressly provides that any displaced person in a City-approved redevelopment project is entitled to relocation payments and assistance under the City policy unless federal law applies, and further provides that even where property is acquired for a public purpose using solely state or local funds, "the provisions of the [Uniform Relocation Assistance and Real Property Acquisition Policies Act] shall apply."

360. In other words, under the City's own ordinance, the URA governs either directly or by mandate in every covered displacement scenario.

361. By asserting to Plaintiff and to administrative and judicial tribunals that the URA did not apply because the project was governed by state law, Defendants concealed that City law itself required application of the URA even under their asserted 'state-only' theory.

362. Defendants possessed direct knowledge of the following material facts: a. That the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA") governed or was mandated for relocation benefits applicable to the NGA redevelopment project, including through incorporation by City law; b. That the Environmental Protection Agency ("EPA") provided federal financial assistance through EPA Region 7, including Targeted Brownfields Assessment ("TBA") services conducted within the NGA project footprint; c. That the EPA conducted environmental-justice review and participated in federal environmental oversight pursuant to the National Environmental Policy Act ("NEPA"); d. That federally funded environmental assessment, sampling, and cleanup activities were performed on properties within the NGA redevelopment area, including Plaintiff's property; e. That reimbursement of acquisition and relocation costs through federal or federally supported mechanisms was authorized and anticipated under Missouri House Bill 514; f. That the NGA site was assembled for transfer to and exclusive use by a federal agency—the National Geospatial-Intelligence Agency ("NGA")—independently triggering federal relocation law; and g. That Defendants affirmatively represented to the EPA and other federal entities that the project was being carried out "in accordance with all applicable federal, state, and local relocation laws," expressly including URA obligations.

363. Each of the above facts independently triggered the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA"), 42 U.S.C. § 4601 et seq., which would have entitled Plaintiff to more than $2,000,000 in relocation benefits—not the $79,000 he received.

364. Defendants did not merely remain silent; they took affirmative steps to conceal federal involvement and the applicability of 62481 § 24.3.

a. Repeatedly asserting—to Plaintiff, the LCRA Hearing Officer, and the courts—that the project "received no federal funds" and that the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA") did not apply;

b. Withholding the EPA Draft Environmental Impact Statement, EPA Record of Decision, Brownfield/TBA funding records, Environmental Justice findings, and federal coordination documents during Plaintiff's relocation proceedings;

c. Creating and maintaining an administrative record that omitted all federal documents, ensuring that Plaintiff and reviewing tribunals could not learn the truth;

d. Submitting knowingly false legal positions, through Defendants' counsel, that federal relocation law was "irrelevant" and "not applicable under any circumstances"; and

e. Providing federal agencies with the opposite narrative—that URA protections applied and would be followed—while simultaneously representing to Plaintiff and state tribunals that URA did not apply.

365. These were not innocent mistakes or legal disagreements.

366. They were intentional acts of deception designed to: a. Conceal the existence of federal funding; b. Prevent Plaintiff from asserting his federal relocation rights; c. Avoid millions of dollars in mandatory relocation payments; d. Expedite clearance of a predominantly Black neighborhood at minimal cost; e. Defeat Plaintiff's relocation appeals by falsifying the governing legal framework.

367. Defendants' November 7, 2016 letter to Plaintiff (Exhibit 1) constitutes an affirmative act of fraudulent concealment.

368. By intentionally omitting any reference to the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA") or Ordinance 62481 § 24.3, and by representing that only Missouri Revised Statute § 523.205 governed Plaintiff's relocation rights, Defendants

concealed controlling law and prevented Plaintiff from discovering the existence of mandatory federal and City-law relocation entitlements.

369. Plaintiff reasonably relied on this official written representation from Defendants' designated relocation administrator in believing that no federal relocation protections existed and that only minimal state benefits were available.

370. This reliance delayed Plaintiff's discovery of Defendants' scheme and independently tolls all applicable statutes of limitations.

371. Defendants' concealment occurred inside formal government proceedings, through:

a. sworn statements by City officials,

b. filings by Defendant's counsel (an officer of the court),

c. determinations by DRP officials and LCRA hearing officers, and

d. written City correspondence asserting no federal involvement.

372. Because these misrepresentations were made by government authorities, relocation specialists, and a court-appointed hearing officer, Plaintiff reasonably relied on them.

373. Plaintiff had no access to the withheld EPA documents, NEPA filings, Brownfields records, or federal coordination communications, and no reason to suspect that Defendants were simultaneously telling the EPA and NGA the opposite story.

374. Reasonable diligence could not have uncovered the concealed facts because:
a. The EPA Draft EIS and ROD were never disclosed; b. Brownfield/TBA funding was not listed in the administrative record; c. Federal emails, coordination letters, and funding authorizations were withheld; d. State tribunals accepted Defendants' false statements as true.

375. Plaintiff first discovered evidence of federal involvement only after obtaining a letter from Tetra Tech, long after the administrative and judicial proceedings had concluded.

376.    Plaintiff has submitted FOIA requests and is awaiting further responsive records concerning additional federal involvement in the NGA land-assembly and relocation process.

377.    Until that time, Plaintiff reasonably believed—based on Defendants' repeated assertions in official proceedings—that no federal funds were used.

378.    As a direct result of this concealment, Plaintiff: a. was denied more than $2,000,000 in federal relocation benefits he was legally entitled to; b. suffered destruction of his long-standing business; c. was wrongfully displaced from his home; d. endured years of litigation built on false premises; e. suffered emotional distress and reputational damage.

379.    Because Plaintiff did not—and could not—discover Defendants' deception until recently, all federal and state claims in this Complaint are timely.

380.    As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff suffered: Loss of relocation benefits exceeding $2 million; Destruction of his business and livelihood; Loss of real property; Loss of personal property and inventory; Emotional distress and humiliation; Litigation costs and consequential losses; Ongoing harm caused by reliance on false government statements.

WHEREFORE, Plaintiff requests judgement on all Defendants for: Compensatory damages; Punitive damages; Equitable relief restoring Plaintiff's rights; Attorney's fees under 42 U.S.C. § 1988; Any other relief the Court deems just and proper.

## COUNT IX — BREACH OF THIRD PARTY BENEFICIARY CONTRACT

*(Against the City of St. Louis, SLDC, LCRA, and DRP)*

*(Breach of Relocation-Services Contract; Plaintiff as Intended Beneficiary)*

381.    Plaintiff incorporates by reference paragraphs 1–378 as though fully set forth here,

382.    The City of St. Louis, the St. Louis Development Corporation ("SLDC"), and the Land Clearance for Redevelopment Authority ("LCRA") entered into contracts with Development Resource Partners, LLC ("DRP") for the purpose of administering relocation services to displaced persons within the NGA redevelopment footprint.

383.    These contracts required DRP—and obligated SLDC, LCRA, and the City—to provide relocation assistance "in accordance with all applicable federal, state, and local relocation laws."

384.    That language necessarily includes compliance with, among others: the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA"), 42 U.S.C. § 4601 et seq.; Missouri relocation statutes, including Chapter 523, RSMo; and the City of St. Louis Relocation Policy codified at Ordinance 62481, whose applicability provision (§ 24.3) governs the use of URA standards and mandates mandatory relocation benefits in covered redevelopment projects.

385.    The stated purpose of these contracts was to ensure that individuals and businesses displaced by the NGA redevelopment—including Plaintiff—would receive relocation benefits, advisory services, notices, and compensation required by the City of St. Louis' Relocation Policy Ordinance 62481.

386.    The relocation-services contracts also required compliance with "all applicable federal, state, and local relocation laws," which necessarily included Missouri's relocation statute, § 523.205. Defendants breached this obligation by refusing to implement the relocation payments, notices, referrals, relocation plans, and business re-establishment payments mandated by § 523.205, and Ordinance 62481

387.    Plaintiff, as a displaced person and a qualified residential/business occupant within the NGA footprint, was a direct and intended third-party beneficiary of these contracts.

388.    Defendants City, SLDC, LCRA, and DRP materially breached their obligations under the relocation-services contracts by: 1.) Failing to provide any advisory services to Plaintiff; 2.) Failing to conduct mandatory relocation interviews, needs assessments, or inventory inspections; 3.) Failing to provide written notices of relocation rights, as required by federal and state law; 4.) Failing to determine business re-establishment benefits; 5.) Failing to provide comparable-replacement-housing evaluations for Plaintiff's residential loft; 6.) Failing to provide written offers based on federally compliant appraisals; 7.) Intentionally denying Plaintiff all URA benefits despite contractual promises to administer them; 8.) Misrepresenting the governing legal standards in order to avoid their contractual obligations; 9.) Constructively nullifying the relocation-services contract by adopting a policy that the URA "did not apply."

389.    DRP's refusal to perform relocation services was not independent conduct—it was done under the direction, approval, and policy guidance of SLDC, LCRA, and the City, all of whom were parties to or beneficiaries of the relocation-services contract.

390.    The City and SLDC further breached their contractual duties by providing false information to DRP, by instructing DRP not to provide URA benefits, and by failing to ensure that relocation services were delivered to intended beneficiaries.

391.    Plaintiff was not an incidental beneficiary but a specifically identifiable, intended beneficiary, as: His property was listed for acquisition under Ordinance 69977; He was classified as a displaced business and residential occupant; The relocation-services contract expressly targeted individuals and businesses displaced by the NGA project; The contract's purpose was to provide federally compliant relocation benefits directly to persons in Plaintiff's position.

392.    Defendants had no discretion to deny relocation services where the contract required full compliance with applicable relocation law.

393.    As a direct and proximate result of Defendants' breaches, Plaintiff suffered substantial damages, including but not limited to: Loss of relocation benefits exceeding $2 million (reflecting URA-mandated payments); Loss of his 75,000-sq-ft business facility; Destruction of Metro MFG; Loss of business equipment, inventory, customers, and accounts; Costs of involuntary displacement; Emotional distress and consequential damages.

394.    Plaintiff's damages were foreseeable and were the natural result of Defendants' failure to provide legally required relocation services promised by the relocation-services contract.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants City of St. Louis, SLDC, LCRA, and DRP for: Compensatory damages in an amount to be proven at trial; Consequential damages; Pre- and post-judgment interest; Attorney's fees as permitted; Declaratory relief recognizing Plaintiff's third-party beneficiary status; Any other relief the Court deems just and proper.

## COUNT X — VIOLATION OF ST. LOUIS ORDINANCE 62481 (CITY RELOCATION POLICY)

(Against City of St. Louis, SLDC, LCRA, and DRP)

395.    Plaintiff incorporates by reference paragraphs 1–392 as though fully set forth here.

396.    Ordinance 62481 is a duly enacted City of St. Louis ordinance that establishes a binding "Relocation Policy for the City of St. Louis."

397.    Its purpose is to ensure that all displaced persons in City-assisted projects are treated "fairly, consistently and equitably" and "do not suffer disproportionate injuries" as a result of such projects.

398.    Ordinance 62481 applies to "Projects" that receive public assistance from the City and that involve, among other things, the use of eminent domain, tax abatement, tax increment financing, tax-exempt revenue bonds, or grants or loans from the City.

399.    The NGA redevelopment project meets this definition because it involved eminent domain, City-approved redevelopment plans, and public financing mechanisms as reflected in Ordinances 69977 and 70074.

400.    Ordinance 62481 § 24.3 provides that any displaced person in a City-approved redevelopment project "will be entitled to receive ... relocation payments and assistance" under the City's Relocation Policy, *unless* one of two conditions applies.

The ordinance then identifies only two exceptions:

(1) *If federal relocation law applies*, including the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA"), then the URA governs; or

(2) *If the displacement results from acquisition for a public purpose using solely   state or local funds*, then the ordinance expressly provides that "the provisions  of  the  URA  shall apply."

In full, the ordinance states:

"Any person who is a displaced person ... will be entitled to receive from the Developer the relocation payments and assistance set forth in this Policy ... unless (1) the provisions of the Federal Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ... are applicable to such displacement; or (2) the

-62-

person is displaced as the result of the acquisition for a public purpose … purchased solely through the expenditure of state or local funds, in which case the provisions of the URA shall apply."

401.   Ordinance 62481 was enacted pursuant to the requirements of Missouri's relocation statute, § 523.205, which obligates condemning authorities to adopt relocation policies containing provisions equivalent to URA. Defendants' violation of Ordinance 62481 therefore also constitutes a violation of the state-law mandate underlying the ordinance.

402.   Plaintiff was a "displaced person" within the meaning of Ordinance 62481 because his property and business were acquired and cleared through eminent domain as part of the NGA redevelopment project, and he was forced to relocate his residence and long-standing business operations.

403.   There is no lawful scenario under Ordinance 62481 in which Plaintiff could receive neither federal nor City relocation benefits; yet Defendants provided Plaintiff with approximately $70,000—only a small fraction of the relocation assistance mandated under applicable law.

404.   Defendants breached their mandatory duties under Ordinance 62481 by providing Plaintiff with no relocation payments, no relocation advisory services, no comparable-replacement-housing evaluation, and no business re-establishment benefits, despite his clear status as a displaced person in a covered project.

405.   As a direct and proximate result of Defendants' violation of Ordinance 62481, Plaintiff suffered substantial damages, including but not limited to: loss of relocation benefits and assistance to which he was entitled under City law; destruction of his business; loss of his residence; and additional economic and consequential damages.

WHEREFORE, Plaintiff requests judgment against Defendants City of St. Louis, SLDC, LCRA, and DRP for: compensatory damages in an amount to be proven at trial; declaratory relief that Defendants violated Ordinance 62481; pre- and post-judgment interest; costs; and any further relief the Court deems just and proper.

## PRAYER FOR RELIEF

Plaintiff respecfully requests that this Court enter judgement in his favor and grant the following relief:

1. Compensatory damages in an amount to be determined at trial;

2. Punitive damages against all individual-capacity defendants;

3. Declaratory relief stating that Defendants violated Plaintiff's constitutional and statutory rights;

4. Injunctive relief requiring Defendants to comply with federal relocation law (URA), Title VI, and constitutional standards;

5. Vacatur of administrative decisions tainted by fraud on the court;

6. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

7. Pre- and post-judgment interest; and

8. Any further relief the Court deems just and proper.

9. Requiring Defendants to produce all EPA, Brownfields, NEPA, and federal coordination documents relating to the NGA-West project.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**/s/ James Osher**

**James Osher**

2830 Magazine Street

St. Louis, Missouri 63106

Telephone: (314) 503-0101

Email: ezw123@hotmail.com

**Plaintiff, Pro Se**

Dated: ___6/25/26___